Dear Dr. Alost:
You requested the opinion of this office concerning a proposed agreement between the Board of Trustees for State Colleges and Universities (the "Board of Trustees"), Northwestern State University ("NSU") and Century Development ("Century") for the construction, maintenance and operation of a private student housing facility on the campus of NSU. You advised that Century responded to NSU's Request for Proposals for a private student housing facility on the University campus, and that negotiations are being pursued in connection therewith.
A Ground Lease Agreement ("Lease") between the parties has been prepared and conditionally approved by the Board of Trustees. The undersigned has cursorily reviewed the Lease; however, this opinion only addresses the concepts set forth in the Lease and not the specific terms and conditions thereof.
The Lease provides that certain unimproved immovable property located on the campus of NSU will be leased by Housing Partnership II, Ltd. (the "Lessee") from NSU for a period of 40 years. The Lessee will thereafter develop and construct a 10 building complex, including approximately 140 apartment units and related facilities for use by students, faculty and staff of NSU (the "Facility"). The improvements to the Facility will be owned by either Century or the Lessee who will lease the units directly to students, faculty and staff of NSU. NSU will be paid a base rental of $1,000 per year together with a percentage of the net cash flow per academic year of the Facility. Only in the event of foreclosure of the Facility can the improvements be leased to non-NSU students, faculty and staff. During the term of the Lease, the Lessor has the option to purchase the Facility and the equipment, as well as a right of first refusal to purchase same should a third party make a bona fide offer. Upon expiration of the Lease, the Board may require the Lessee, at its expense, to demolish the Facility and restore the land to substantially the same condition as existed on the date of the Lease.
Your first question is whether the Lease would need approval of the State Bond Commission prior to execution?
The authority of the Board to lease the ground to the Lessee is set forth in La. R.S. 17:3361(A) which provides in pertinent part as follows:
 "A. Each board may grant leases of any portion of portions of the grounds or campus of any college or university or of other immovable property under its supervision and management, for a term not to exceed ninety-nine years for each lease, to any of the following:
* * *
 (5) A private entity, provided such private entity shall be obligated under the terms of the lease agreement to construct improvements on the leased premises which will further the educational, scientific, research or public service functions of the board.
 B. Each board may permit the lessees to erect, construct, and maintain thereon fraternity or sorority houses or homes, student centers, facilities for religious worship and instruction, armories, storehouses, and other structures. Contracts entered into by a private lessee for the performance of work on the leased premises for the erection, construction, or maintenance of improvements on the leased premises shall not constitute public works contracts.
* * *
 D. The architectural plans for each house or other structure shall be approved by the board prior to construction on the leased grounds.
 E. The provisions of R.S. 39:1643 and Part I of Title 41 of the Louisiana Revised Statutes of 1950 shall not be applicable to agreements authorized by this Part.
The only reference to the State Bond Commission in this part is contained in La. R.S. 17:3366 authorizing a university to give a loan guaranty with the approval of the State Bond Commission. That provision is inapplicable to the facts herein and furthermore is subject to constitutional challenge. See Op. Atty. Gen. 89-72.
State Bond Commission approval is required for the issuance of bonds or other obligations of the state or any state board, agency, or commission, or by any political subdivision of the state. Article VII, Section 8(B), La. Const. of 1974. It does not appear that any bonds will be issued in order to construct the dormitory; and, if any debt is issued, it will be the private debt of Century and/or the Lessee, not of the Board of Trustees nor of NSU.
La. R.S. 39:1410.31 also requires State Bond Commission approval of any agreement, including, but not limited to agreements of lease, lease-purchase or third party financing, entered into by, on behalf of or with the state, directly or through any state board, department, commission, authority or agency, providing for the outlay of funds in excess of one hundred thousand dollars, in any fiscal year, for capital improvement or expenditure, including, but not limited to, equipment, buildings, land, machinery, renovations, major repairs and construction. Any agreement made in violation of this section is null and void. The exceptions to the requirement of State Bond Commission approval are set forth in paragraph C and include "capital outlay projects approved by the legislature pursuant to Article 7, Section 11(B) of the Louisiana Constitution of 1974, or to the expenditure of funds previously appropriated by the legislature, or to any multi-year agreement dealing which movable property containing an appropriation dependency clause which provides for no penalty upon termination or failure to fund."
The Lease does not provide for the outlay of funds in excess of $100,000 by the Board of Trustees or NSU in any fiscal year, so La. R.S. 39:1410.31 does not appear applicable to the Lease.
Nor is the undersigned aware of any other provision which would require the Lease to be approved by the State Bond Commission prior to execution thereof.
Your second question is whether the approval of any other state agency is required prior to execution of the Lease?
It is assumed that your question is directed to agencies other than the Board of Trustees who must approve the agreement (La. R.S. 17:3361), waive certain rules relative to the erection, construction and maintenance of the structure (La. R.S. 17:3362) and waive certain rules relative to the conduct and social activities of people in the structures to be constructed pursuant to La. R.S. 17:3361 (La. R.S. 17:3364).
In addition to the Board of Trustees approval, it is necessary to obtain the approval of the Board of Regents. La. R.S.17:3129. Furthermore, if the provisions of the Lease concerning the option to purchase or the right of first refusal were exercised, it would be necessary for NSU to go through the capital outlay process. Except for the approvals which must be obtained for any construction project, i.e. State Fire Marshall's Office and possibly the Department of Environmental Quality, the undersigned is unaware of any other state agency which must approve the Lease.
Your final question is whether the provisions of Section 13.02 of the Lease would cause either the Board of Trustees or NSU to be in violation of the obligations imposed by outstanding dormitory revenue bonds?
In summary, Section 13.02 provides that the Lessee agrees to offer units in the Facilities for lease on a first-priority basis to Priority Occupants (which appears to exclude only unmarried freshmen and sophomore students younger than 25 years) as follows:
 A. For any Academic Year in which there are existing dormitories on the NSU campus whose revenues are the security for outstanding dormitory revenue bonds (the "Student Housing System Facilities"), Lessee agrees that Lessor may assign freshmen and sophomore students to such Student Housing System Facilities to the extent deemed necessary by Lessor to assure the maximum use and occupancy of such Student Housing System Facilities pursuant to the outstanding bond documents. If the Lessor determines that it is required by the terms and conditions of the outstanding bond documents to assign other on-campus occupants from the pool of Priority Occupants to the Student Housing System Facilities in order to assure maximum use and occupancy of the Student Housing System Facilities pursuant to the bond documents, then Lessor shall give written notice of such determination to Lessee on or before the sixty-fifth day prior to the commencement of the next academic year. Upon giving such notice, Lessor may assign on-campus occupants in a certain priority order to the Student Housing System Facilities for the next academic year, to the extent deemed necessary by Lessor for the maximum use and occupancy of said Student Housing System Facilities pursuant to the bond documents; provided, however, that such assignment is made at least fifty days prior to the commencement of the next academic year and provided that no Priority Occupants which have executed leases with Lessee for the next academic year prior to the date on which Lessee received the Facilities Assignment Notice will be assigned to the Student Housing System Facilities.
 B. Subject to the foregoing, NSU shall assign the Priority Occupants to the Facility in priority over other housing facilities, until the Facilities general Gross Rentals meeting the Gross Rentals Threshold for such academic year.
 C. Subject to the foregoing, if NSU has not assigned to the Facilities, at least 45 days prior to the commencement of each Semester during the Term, a sufficient number of Priority Occupants for the Facilities to general Gross Rentals meeting the Gross Rental Threshold, then NSU shall assign all other on-campus occupants to the facilities to the extent necessary for the Facilities to meet the Gross Rental Threshold for the applicable Academic Year.
 D. Notwithstanding the foregoing, NSU shall not be obligated to require any on-campus occupant to lease a unit in the facilities.
Information from your office and the Lease indicates that there are three outstanding bond issues secured by the Housing System at Northwestern, namely, Student Housing System Revenue Bonds of 1960 (Series A, Series B and Series C) (the "1960 Bonds"), Student Housing System Revenue Bonds of 1964 (Series A) (the "1964 Bonds"), and Student Housing System Revenue Bonds of 1965 (the "1965 Bonds") (collectively, the "Bonds"). The undersigned was supplied with copies of the Bond resolutions.
The 1960 Bonds defines "System" to mean certain named dormitories, together with "all housing, dining and/or other auxiliary enterprises hereinafter acquired, owned or operated by the College which may be added to the System while any of the Bonds, or additional parity bonds that might be issued under the terms of this resolution, are outstanding". It does not appear that the Facilities while they are owned and operated by the Lessee would be part of the System. Of course, if NSU or the Board exercised its option to purchase the Facilities, the Facilities would become part of the System and the revenues derived therefrom would be pledged to the outstanding 1960 Bonds.
The 1960 Bond Resolution authorizes the issuance of additional bonds to be issued on a parity with the 1960 Bonds under certain terms and conditions, provided that the additional facility or facilities to be built with the proceeds of such parity bonds are made a part of the System. Again, the transaction at issue does not involve any debt of NSU or the Board.
However, the 1960 Bond Resolution further provides as follows:
"SECTION 33. The Board covenants and agrees that:
* * *
 (6) So long as any of the Bonds are outstanding against the System the Board will not do or suffer any act or thing whereby the System or any part thereof might or could be impaired, and it will at all times maintain, preserve, and keep all structures and equipment pertaining thereto and every part and parcel thereof in good condition, repair, and working order.
 (7) The Board shall establish and maintain so long as any of the Bonds are outstanding against the System, such parietal rules, rental rates and charges for the use of the System as may be necessary to (1) assure maximum occupancy and use of said System and (2) provide together with any other funds herein pledged to payment of the Bonds (a) the operating and maintenance expenses of said System, (b) the debt service on the Bonds, (c) the required reserve therefor, and (d) the System Repair and Replacement Reserve Account." (Emphasis added)
There are similar provisions in the resolutions authorizing the 1964 Bonds and the 1965 Bonds. The 1964 Bonds broadened the definition of "System" to include the student union building while the 1965 Bonds increased the facilities included within the System by the addition of several dormitories and a cafeteria.
This office understands that Section 13.02 of the Lease is an attempt to protect the holders of the outstanding Bonds by providing a mechanism, to the extent the Lessor deems necessary, to assure the maximum use and occupancy of such Student Housing System Facilities pursuant to the outstanding Bond documents and to assure the maximum use and occupancy of the Facilities. This office is concerned that holders of the outstanding Bonds could argue that the provisions of Section 13.02 of the Lease violate the Bond covenants, especially the provision that prohibits the Board from taking, or allowing any action to be taken, which could impair the System. The outstanding Bondholders could also argue that the outstanding Bonds no longer have first priority on the students and the fees, charges, rentals and income of the System. It must be emphasized that this office does not believe that Section 13.02 necessarily impairs the System or violates the rights of the holders of the Bonds, but merely that a Bondholder could argue that the Lease has that effect.
It is suggested that language be added to the Lease to clarify that the Lease will be subordinate to the outstanding Bonds and that there is no intent to impair the security for the Bonds. Furthermore, it is suggested that language be added to the effect that the Board or NSU has the right to renovate the System and if it so desires, to expand the System. Language similar to the following is suggested:
 Notwithstanding anything contained herein to the contrary, the outstanding Student Housing System Bonds shall be accorded first priority on all fees, charges, revenues and/or income levied and collected by the Board and/or NSU with respect to the operation and use of the Student Housing Systems Facilities. Should any provision of this Lease be found to be in conflict with the Bond Documents, impair the security for the Bonds, or impede the payment of the debt service or reserve requirements therefor, the provisions of the Bond Documents shall control and the Lease shall be construed and administered so that it will not impair the security for the Bonds, the payment of debt service or the funding of the reserve requirements. For purposes of this paragraph, "Bond Documents" shall mean the Series 1960 Bonds, the Series 1964 Bonds, the Series 1965 Bonds, the resolutions authorizing the issuance of the 1960 Bonds, the 1964 Bonds and/or the 1965 Bonds, or any other document pertaining to the security and payment of the outstanding 1960 Bonds, the 1964 Bonds and/or the 1965 Bonds.
 Notwithstanding anything herein to the contrary, nothing in this Lease shall be construed to prohibit, prevent or limit the ability of the Board or NSU to renovate, remodel or update the existing Student Housing System Facilities nor to construct, acquire, purchase or expand the System if it appears that the expansion is necessary.
The undersigned must caution you that the addition of these paragraphs, or language substantially similar thereto, is no guarantee that Bondholders will not object to the Lease, however, we believe that the position of the Board or NSU would be strengthened with the addition of such language to the Lease.
Trusting this adequately responds to your request,
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: MARTHA S. HESS Assistant Attorney General
RPI/MSH/jav